MILDRED I. DOWNS, Appellant, v. THE INDUSTRIAL COMMISSION *et al.* (Capri Foods, Inc., Appellee).

Fifth District (Industrial Commission Division) No. 5—85—0321WC

Opinion filed April 25, 1986.—Rehearing denied June 6, 1986.

Paul A. Guzzardo, of Calvo & Guzzardo, of Granite City, for appellant.

G. Bradley Hantla, of G. Bradley Hantla, Ltd., of Litchfield, for appellee.

PRESIDING JUSTICE WEBBER delivered the opinion of the court:

Claimant filed an application for adjustment of claim under the Workers' Occupational Diseases Act (Ill. Rev. Stat. 1983, ch. 48, par. 172.36 *et seq.*). An arbitrator awarded her both temporary total disability and permanent partial disability benefits. On review the Industrial Commission reversed the arbitrator and denied benefits. The Commission found that claimant did not suffer from an occupational disease or become exposed to one, and further found that her condition was not the result of injury under the Workers' Compensation Act (Ill. Rev. Stat. 1983, ch. 48, par. 138.1 *et seq.*). Claimant then sought review in the circuit court of Montgomery County. That court confirmed the Commission, and claimant appeals.

The evidentiary record disclosed that claimant was a meat wrapper for the respondent, Capri Foods, Inc., d/b/a Capri IGA, a supermarket in Hillsboro, and had been so employed for 18 years. Her duties included wrapping, pricing, and displaying meat. The meat was placed on trays which were shelved at various heights ranging from

six inches above the floor to a distance above claimant's head. The trays varied in weight, depending upon the type of meat. Hams weighing 8 to 10 pounds each were placed four to a tray; roasts weighing 3 to 6 pounds each were placed six or seven to a tray. During the holiday season claimant handled turkeys which came two to a box, each weighing 23 to 24 pounds. About 500 cases of turkeys arrived each holiday. Claimant also unloaded cases of meat from delivery trucks. These cases weighed 60 to 70 pounds each. Claimant testified that she worked eight hours per day, five days per week, lifting trays from the shelves to wrap, price, and display the meat.

Claimant's physical complaints centered in her back and right leg. According to her testimony, the condition worsened during the 30-day period preceding June 5, 1980, the day upon which she left her job. She stated that she has not worked since that date.

Claimant was admitted to St. John's Hospital in Springfield on June 6, 1980. She received traction therapy and a myelogram. She was again hospitalized in November 1980 when additional traction therapy and another myelogram were received and performed. In January 1981 she was again hospitalized and another myelogram was performed. In March 1981 she was referred to a doctor in Canada. That doctor performed an enzyme injection of the affected area of her back.

On cross-examination claimant admitted that she had had difficulty in walking while on vacation in September 1979 and further admitted to having "back spells" off and on during the years preceding the hearing. She had been told that she had degenerative-disc disease.

The depositions of three physicians were introduced into the record. They were those of Dr. Basilius Zaricznyj, an orthopedic surgeon, Dr. Lyle Wacaser, a neurosurgeon, and Dr. Marshall Conrad, an orthopedic surgeon. All were in substantial agreement as to the diagnosis: degenerative-disc disease and arthritis of the spine. However, they differed on the etiology of the conditions.

Dr. Zaricznyj stated that a degenerated disc can result from one injury, many injuries, or simply through the aging process alone. He said that degenerative-disc disease is more frequently found in persons not engaged in heavy physical labor. On cross-examination he stated that lifting heavy boxes of meat for 40 hours per week for 17 or 18 years could cause the disease, but also maintained that it can occur in the absence of heavy lifting.

Dr. Wacaser stated that when he examined claimant he found a bulging disc at L4—L5. He said that a bulging disc can result from either trauma or degeneration and the only way to determine the

cause is through the history taken from the patient. He further stated that when an individual, such as claimant, has had previous back problems and then develops degenerative-disc disease, the cause is probably deterioration. He said that employment of the type engaged in by claimant would aggravate the condition.

Dr. Conrad testified to an opinion, based upon claimant's history and a hypothetical question, that repeated bending and lifting at work may have caused claimant's degenerative-disc disease. On cross-examination he stated that the disease may occur as a result of either trauma or the normal aging process. He stated that although claimant's condition could have occurred regardless of her employment, the employment aggravated the condition.

No new evidence was presented to the Commission on review. As has been indicated, the Commission denied benefits. The salient portion of its order is:

> "The Commission finds that the Petitioner did not sustained [sic] an occupational 'disease' within the generally understood meaning of that term as a condition which resulted from a [sic] etiologic agent; that 'degenerative disc disease,' at least in the context of this record, does not constitute such a disease; and that the testimony as to repeated bending and lifting does not constitute exposure to an occupational disease within the meaning of the relevant Act. The Commission further finds that while the Petitioner may suffer from a back condition, her condition of ill-being is not related to a compensable accident under the Workers' Compensation Act's definition of accident because the record in this case, including Petitioner's own testimony, fails to establish a specific time, place and occurrence as required by the Act. [Citation.] Furthermore, the record provides no basis, in factor [sic] medical opinion for a finding of 'accident' on a 'repetitive trauma' theory."

Claimant presents two issues for our consideration: (1) whether the Commission erred in holding that degenerative-disc disease is not an occupational disease within the meaning of the statute; (2) whether claimant established by the manifest weight of the evidence that she suffered from an occupational disease. We agree with the Commission on the first issue and therefore need not be concerned with the second.

Prior to its amendment in 1975, section 1(d) of the Workers' Occupational Diseases Act (Ill. Rev. Stat. 1973, ch. 48, par. 172.36(d)) provided as follows:

> "[T]he term 'Occupational Disease' means a disease arising out

of and in the course of the employment. Ordinary diseases of life to which the general public is exposed outside of the employment shall not be compensable, except where the said diseases follow as an incident of an occupational disease as defined in this Section."

In 1975 section 1(d) of the Workers' Occupational Disease Act (Ill. Rev. Stat. 1975, ch. 48, par. 172.36(d)) was amended to provide as follows:

"[T]he term 'Occupational Disease' means a disease arising out of and in the course of the employment or which has become aggravated and rendered disabling as result of the exposure of the employment."

In 1976 the following language was added to section 1(d) of the Workers' Occupational Diseases Act (Ill. Rev. Stat. 1977, ch. 48, par. 172.36(d)):

"*** Such aggravation shall arise out of a risk peculiar to or increased by the employment and not common to the general public."

There appears to be no direct case authority in this State interpreting the amendments to section 1(d). They are referred to obliquely in *Bunney v. Industrial Com.* (1975), 75 Ill. 2d 413, 389 N.E.2d 536 (noting that the Act had been amended to cover situations involving the aggravation of a preexisting condition) and *Peoria County Belwood Nursing Home v. Industrial Com.* (1985), 138 Ill. App. 3d 880, 487 N.E.2d 356 (noting that the legislature nullified the rule in *International Harvester Co. v. Industrial Com.* (1973), 56 Ill. 2d 84, 305 N.E.2d 529, that aggravation of a preexisting disease must be traceable to a specific time, place and cause). Claimant has tacitly acknowledged this fact by citing cases from other jurisdictions. There is a clear split of authority among the courts of review in our sister States which have considered the issue of whether a degenerative condition, such as degenerative-disc disease, is an "occupational disease." See generally 1B A. Larson, Workmen's Compensation sec. 41.33, at 7—373 through 7—388 (1986).

The courts of New York have repeatedly held that injuries which have resulted from repeated bending or lifting may constitute an occupational disease within the meaning of New York law (*e.g.*, *Keefer v. Norton Co.* (1979), 68 A.D.2d 961, 414 N.Y.S.2d 764 (holding that a herniated disc resulting from repeated lifting is an occupational disease); *Goyer v. Fred K. Blanchard, Inc.* (1966), 25 A.D.2d 892, 269 N.Y.S.2d 338 (holding that petitioner sustained an occupational disease when she experienced neck pain by repeated bending and turn-

ing); *Fellows v. Syracuse Supply Co.* (1965), 24 A.D.2d 791, 263 N.Y.S.2d 785 (holding that heavy lifting may be a distinctive feature of one's employment such that back pain and herniated disc or osteoarthritis degeneration caused by lifting may constitute an occupational disease)). In *Freuhauf Corp. v. Workmen's Compensation Appeals Board* (1968), 68 Cal. 2d 569, 440 P.2d 236, 68 Cal. Rptr. 164, the Supreme Court of California held that an employee's back condition resulting from repeated bending, twisting, and lifting is properly classified as an occupational disease rather than an injury. The *Freuhauf* court noted, however, that the California legislature has not defined the term "occupational disease" and has specifically rejected a definition which would limit "occupational diseases" to those diseases which are peculiar to a particular employment and to which the general public is not exposed.

The interpretations given to the term "occupational disease" by the courts of Michigan have been inconsistent. In *Carter v. International Detrola Corp.* (1950), 328 Mich. 367, 369, 43 N.W.2d 890, 891, the Supreme Court of Michigan held that repeated muscle use is "not so unique as to be 'characteristic of or peculiar to the business of the employer'" since muscle use is common to most employment. Accordingly, the court held that plaintiff's muscle condition resulting from repeated lifting as a factory worker did not constitute "a 'disability which is due to causes and conditions which are characteristic of and peculiar to the business of the employer'." (328 Mich. 367, 369, 43 N.W.2d 890, 891.) The following year, the supreme court held that a plaintiff's lumbosacral strain and possible herniated disc resulting from repeated lifting and carrying heavy boxes was an occupational disease due to causes (bending and twisting) "peculiar to the occupation." (*Underwood v. National Motor Castings Division* (1951), 329 Mich. 273, 276, 45 N.W.2d 286, 287.) In *Derwinski v. Eureka Tire Co.* (1977), 79 Mich. App. 750, 263 N.W.2d 30, the Michigan Court of Appeals held that degenerative disc syndrome caused by repeated bending and lifting is a "disease" within the meaning of the Michigan apportionment statute. The court of appeals later noted that the *Derwinski* court did not consider whether repeated bending and lifting was "peculiar to the employment." (*Carter v. Lakey Foundry Corp.* (1982), 118 Mich. App. 325, 333, 324 N.W.2d 622, 625.) The *Carter* court recognized that degenerative disc disease is an ordinary disease of life which may result from either degeneration through the aging process or trauma through repeated bending and lifting in one's employment. For this reason, the court stated that Michigan Workers' Compensation Appeal Board should "carefully consider the question

of whether plaintiff's disability may be attributable to the unquestionably peculiar nature of his employment." 118 Mich. App. 325, 333, 324 N.W.2d 622, 625.

The highest courts of both Ohio and New Mexico have taken the position that degenerative diseases are not "occupational diseases" within the meaning of the statutes of those States. In *Popham v. Industrial Com.* (1966), 5 Ohio St. 2d 85, 86-87, 214 N.E.2d 80, 81-82, the Supreme Court of Ohio held that because degenerative-joint disease generally results from ordinary wear and tear and is usually an affliction incident to aging, the disease is not "peculiar to a particular employment" as required by statute. In *Marable v. Singer Business Machines* (1978), 92 N.M. 261, 586 P.2d 1090, the plaintiff alleged that she sustained curvature of the spine and arthritis from repeated lifting of heavy objects. In holding that the alleged diseases were not occupational diseases, the Supreme Court of New Mexico stated:

> "Lifting heavy objects while working on a loading dock is 'peculiar to the occupation of plaintiff, *i.e.*, a condition of employment to which all dock workers are subject.' Nevertheless, other kinds of employment involve the lifting of heavy objects.
>
> An 'occupational disease' does not include the ordinary disabilities of life such as ***, curvature of the spine or arthritis to which the general public is exposed unless the claimant can allege and prove how and why that disability is peculiar to claimant's occupation. It must be distinguished from disabilities suffered by the general population." (92 N.M. 261, 263, 586 P.2d 1090, 1092.)

Unlike the statutes of Ohio and New Mexico, which require that the "disease" be peculiar to a particular employment, the Workers' Occupational Diseases Act requires that the aggravation of the disease arise out of a "risk" peculiar to a particular employment. Since claimant maintains that her degenerative-disc disease was aggravated by her employment, it is necessary to determine both whether her condition was aggravated by the exposure of the employment and whether the risk of repeated bending and lifting is peculiar to or increased by claimant's employment as a meat wrapper and not common to the general public.

The question of whether claimant's condition was aggravated by the exposure of the employment is simply a question of causation. Section 1(d) of the Workers' Occupational Diseases Act (Ill. Rev. Stat. 1983, ch. 48, par. 172.36(1)(d)) provides:

> "A disease shall be deemed to arise out of the employment if there is apparent to the rational mind, upon consideration of all

the circumstances, a causal connection between the conditions under which the work is performed and the occupational disease. The disease need not to have been foreseen or expected but after its contraction it must appear to have had its origin or aggravation in a risk connected with the employment and to have flowed from that source as a rational consequence."

Although that portion of the statute excluding ordinary diseases of life to which the general public is exposed has been repealed, such a criterion is still relevant to the determination of whether a disease is causally connected to one's employment. The fact that the public in general is exposed to a certain disease lessens the chances that a person's employment causes or aggravates a disease.

As we have already indicated, the medical experts were agreed on the diagnosis of claimant's condition, but they did not agree on its cause. We agree with the Michigan court in *Carter* that causation must be carefully examined in such cases, and where there is conflicting medical evidence as to whether a particular disability is sufficiently connected with the employment to constitute an occupational disease, it is the province of the Commission to resolve such differences. (*Fernandez v. Industrial Com.* (1978), 71 Ill. 2d 283, 375 N.E.2d 81.) In our opinion there was ample evidence in the instant record from which the Commission could deduce that claimant's condition was not aggravated by her employment and therefore does not constitute an "occupational disease" within the meaning of the statute.

Furthermore, it does not appear that claimant was exposed to any greater risk, as required by statute, than was the general public. The risk obviously is the bending and lifting. This is characteristic of many occupations and is a common movement made often by almost every human being in going about the ordinary affairs of life. The bending and lifting was not a "risk peculiar to or increased by the employment and not common to the general public." Ill. Rev. Stat. 1983, ch. 48, par. 172.36(d).

We are therefore of the opinion that the Commission was correct in holding that the claimant did not suffer from an occupational disease.

The Industrial Commission also held that the claimant did not sustain an "accidental injury" within the meaning of the Workers' Compensation Act since the record failed to establish a specific time, place and cause of the occurrence. At the time of making that ruling the Commission did not have the benefit of this court's decision in *Peoria County Belwood Nursing Home v. Industrial Com.* (1985), 138 Ill.

App. 3d 880, 487 N.E.2d 356; *appeal allowed* (1986), 111 Ill. 2d 595. Although claimant's counsel at oral argument insisted that relief was sought under the Workers' Occupational Diseases Act and not under *Belwood*, we believe that the Commission should review the record in the light of *Belwood* and under section 19(a)(1) of the Workers' Compensation Act (Ill. Rev. Stat. 1983, ch. 48, par. 138.19(a)(1)).

That portion of the Commission's order finding that the claimant did not suffer from an occupational disease is therefore affirmed; that portion finding that she did not sustain an accidental injury is reversed, and the cause is remanded to the Commission to consider the accidental injury portion of its order in the light of *Belwood*.

Affirmed in part, reversed in part, and remanded with directions.

McNAMARA, LINDBERG, BARRY, and KASSERMAN, JJ., concur.